WILSON *v.* LUCK.

4-6571                                    156 S. W. 2d 795

Opinion delivered December 15, 1941.

*Steve Carrigan, George Edwin Steel* and *George R. Steel,* for appellant.

*John P. Vesey* and *W. S. Atkins,* for appellee.

SMITH, J. This is the second appeal in this case, which is a contest over the nomination for the office of county judge of Hempstead county at the primary election held by the Democratic Party in that county on August 27, 1940. The opinion on the former appeal appears in 201 Ark. 594, 146 S. W. 2d 696.

Upon the remand of the cause there was a second trial pursuant to the directions of that opinion. It was, for the second time, found that Luck had received a majority of the qualified votes cast at that election, and he was declared to be the party nominee, and from that judgment is this appeal.

The present record was prepared pursuant to Rule 16 of this court, so that we have before us the record made at both trials. The record relating to the second trial is larger even than that pertaining to the first. It presents every evidence that the case was tried by opposing counsel with great care and skill, and that they were given every opportunity by the trial court to present their respective testimony. The second trial began April 7, 1941, and was concluded May 31, 1941.

The last witness had been called, except that contestee proposed to offer testimony to the effect that certain electors, who voted for him, but whose names did

not appear upon the published list of voters, had, in fact, paid their poll taxes and were permitted to vote without having their right to vote questioned.

The record reads as follows: "Mr. Steel: We stipulate that contestee could prove by these respective witnesses, whose receipts have been admitted in testimony, that when they cast their ballot, their right to vote was not questioned and that they did not know their names were not on the official list and they at that time had in their possession their original poll tax receipts. It is not contended, though, that they carried their receipts with them. Mr. Vesey: No. Mr. Steel: We have no further witnesses that we know of, your honor, except the permission to go back into that Blevins box and see if there is another vote of O. M. Yokem. Do you have any further testimony? Mr. Vesey: No, we have got no further testimony. Mr. Steel: The contestant rests."

As we understand the record, the ballots of the electors referred to were counted for appellee. Their exclusion would change the result, but, in our opinion, they were properly counted. The law requires the publication of the names of all persons who pay their poll taxes (§ 4696, Pope's Digest), and, as we said in the former opinion in this case, there is a *prima facie* presumption of the verity of this publication. This does not mean that a person has the right to vote, because his name appears on the printed list. He may not do so unless he is otherwise qualified. Nor does it mean that he may not vote because his name does not appear on the printed list of voters, if he is otherwise qualified. But it does mean that, *prima facie*, those persons whose names appear on the printed list of voters are the only persons entitled to vote. The person whose name does not appear must furnish evidence of his eligibility to vote.

Now, this list of voters is not otherwise published, and the law requires no other publication. No one would know definitely whether his name appears on the published list. The only persons having this information are: (1) the collector; (2) the county clerk; (3) the elec-

tion commissioners; (4) the printer; and (5) the election officials. These lists are published for the use of the judges of the election. It is they who have them. The law requires that each judge of the election be supplied with a copy.

Section 4745, Pope's Digest, provides that "No person shall be allowed to vote at any primary election held under the laws of this state, who shall not exhibit a poll tax receipt, or other evidence that he has paid his poll tax within the time prescribed by law to entitle him to vote at the succeeding general state election. Such other evidence shall be: (a) a copy of such receipt duly certified by the clerk of the county court of the county where such tax was paid. (b) Or such person's name shall appear upon the list required to be certified to the judges of election by § 4696. Or, if any person offering to vote shall have attained the age of twenty-one years since the time of assessing taxes next preceding such election, . . . ., and shall submit evidence by written affidavit, satisfactory to the judges of election, establishing that fact, he shall be permitted to vote."

This section of the statutes further provides that "All such original and certified copies of poll tax receipts and written affidavits shall be filed with the judges of election and returned by them with their other returns of election, and the said judges of election shall, in addition to their regular list of voters, make an additional list upon their poll books of all such persons permitted by them to vote, whose names do not appear upon the certified list of poll tax payers, and such poll books shall have a separate page for the purpose of recording names of such persons."

These provisions were not complied with in the cases of the electors referred to by counsel, and it is, therefore, insisted that the ballots of these electors should be excluded from the count. But we do not think so. To so construe the law would, in many cases and in the cases of the electors here in question, disfranchise electors who had qualified themselves to vote.

We know, as a practical matter, that very few electors actually exhibit their poll tax receipts when they

vote. When the elector is otherwise qualified, and has paid his poll tax, he has the right to presume that his name appears on the published list, and if his right to vote is not questioned he will not be required to attach his poll tax receipt to his ballot. If his right to vote is questioned, and it may be if his name does not appear on the printed list, then he must comply with the statute and furnish the evidence of his right to vote required by law.

The record then recites that, after a recess, and without taking further evidence, "The court and the attorneys checked through all their lists to see how they coincided." To understand subsequent proceedings we copy the recitals of the record thereafter: "Mr. Steel: At this time, contestant moves the court for a judgment for contestant for the reason that after the final and complete tabulation of all the votes, the court found to be bad, and deducting the bad votes from the total as certified by the Democratic Central Committee, it appears that contestant received a majority of the legal votes cast of eleven and now we ask for a judgment for the contestant and ask that he be declared the Democratic nominee. The Court: There are quite a few votes the court has not passed upon. Mr. Vesey: I suppose there are not less than thirty poll tax receipts. At this time, it was decided by the court to recount the McCaskill box. Mr. Steele: The contestant objects to the court at this stage of the case examining and attempting to recount the ballots in McCaskill precinct or any other precinct for the reason that there is no evidence whatever tending to impeach the verity of the election returns. They are presumed to speak the truth, and for the further reason that since the ballots have been transferred from one person to another in the hands of the committee, they have lost their integrity. The Court: Overruled. The contestant objected to the above ruling of the court and at the time asked that his exceptions be noted of record, which was accordingly done. Mr. Steel: And in order that this record might be complete, we now offer to show by the circuit clerk, who is temporarily in custody of those ballots since they left the treasurer's office, that they have been in the custody of a committee composed of J. A. Davis,

Luther Higgason, and Clifford Franks, two of whom are recognized partisans in this case, and part are now contained in separate envelopes and part in the original box, and some were cast and appear upon the registry of voters and cannot be found, to-wit: Mr. and Mrs. Gradon Anthony; and contestant excepts further for the reason that the original ballots have lost their integrity by reason of being left in the office of the circuit clerk and taken out of the original ballot boxes and the sealed packages in which they were contained have been broken. Mr. Vesey: If the court please, it is our position under this state of facts that this entire box ought to be thrown out. Here is a box on the face of it, after recounting, it shows that ballots were taken from Mr. Luck and transferred and given to Mr. Wilson and we at this time want to offer proof that this box was kept out all night and not brought in until morning. Mr. Steel: Contestant renews his motion to disregard the court's findings from his examination of these original and duplicate ballots for the reason that there has been no evidence offered tending to impeach the verity of the election returns, and since that election was nine months ago, this box has been from pillar to post and the opportunity has been afforded for mutilation, changes and alterations and substitutions and therefore affirmative evidence will control. The Court: It looks like you have got affirmative evidence. They made a mistake of sixteen ballots in their total. As was stated, the purpose of this contest is to find out who got the most legal votes.''

As we understand this record, the facts are as follows: Appellee had alleged irregularities in the election held in McCaskill township, but it offered no testimony to sustain that allegation. Counsel for appellant opposed a recount of the votes cast in McCaskill township, for the reasons stated, and for the additional reason that the ballots had lost their presumption of verity through the manner in which they had been kept and the opportunities afforded for mutilation, changes, alterations and substitutions, and that, therefore, the returns from this township should be counted as certified by the election officials.

Upon the recount made by the court of what was said to be the original ballots cast in McCaskill township, appellant lost eight votes and appellee gained that number. The court said this was affirmative evidence of irregularities; and so it was. But it was evidence not appearing until after the recount. Counsel for appellee stated he wished to offer testimony that ''This box was kept out all night, and not brought in until morning.'' This would, without satisfactory explanation, afford justification for the recount, but no testimony was offered to sustain that charge, but now that a discrepancy of eight votes has been found, this justifies a recount upon the remand of the cause.

Of more importance than the mere decision of this contest is the establishment of rules which must govern in such cases. No showing justifying a recount had been made when that action was taken; but, even so, the ballots should not have been recounted unless the showing was also made that the ballots to be recounted were the identical ballots cast at the election and had not been changed or otherwise tampered with.

It was said in the case of *Patton* v. *Coates,* 41 Ark. 111, and restated, with more elaboration, in the case of *Powell* v. *Holman,* 50 Ark. 85, 6 S. W. 505, that ''The official returns'' (of an election) ''are quasi records and stand with all the force of presumptive regularity, and *prima facie* integrity, not only till suspicion is cast upon them, but until their self-authenticated verity is overcome by affirmative proof that they do not speak the truth. (Citing authorities.) These returns may be impeached by any legitimate evidence, showing that they do not speak the truth, and when so overcome, they lose their character as evidence, and thereupon, other sources must be looked to for testimony in ascertaining and establishing the result of the vote.''

In the case of *Velvin* v. *Kent,* 198 Ark. 267, 128 S. W. 2d 686, the court refused to open and recount the vote in several townships upon the mere allegation of fraud. In affirming that case it was said: ''These charges were serious and grave, but they did not prove themselves.

Forceful and emphatic denunciation at this time does not supply proof wholly lacking upon the trial.''

We, therefore, hold that, while it was error to recount the ballots cast in McCaskill township, in the absence of proof casting suspicion upon the returns as certified, yet, the discrepancy which developed makes that showing ample to authorize a recount, provided it is first shown that the ballots to be recounted are the identical ones cast at the election. If that showing is not made, then the returns as certified must stand as correct until, as was said in the case of *Powell* v. *Holman, supra,* other sources have been looked to for testimony in ascertaining and establishing the result of the vote.

Error was assigned in the action of the court in counting for appellee the votes of certain qualified electors who did not vote in the township in which they resided. It is conceded that there were not enough of these, in themselves, to change the result, but, in any view, the election is very close, and the decision of this point does not appear to be unimportant. We, therefore, decide it.

Section 1, of art. III, of the Constitution, prescribing the qualifications of electors, requires that the elector ''has resided in the state twelve months, and in the county six months, and in the voting precinct or ward one month, next preceding any election, where he may propose to vote, * * *.'' If he has thus resided, then he (and, now, she, also) ''shall be entitled to vote at all elections by the people.''

This requirement, as to residence, is, of course, mandatory, and requires the elector to vote in the precinct or ward in which he had resided for one month next preceding the election, and not elsewhere. No consideration of the convenience of the elector or any practice in which he may have been permitted to indulge can abrogate and render nugatory this mandatory provision of the constitution.

We said, in the case of *Jones* v. *Floyd,* 129 Ark. 185, 195 S. W. 360, that ''Residence is, therefore, an essential prerequisite without which one can not become qualified

to vote, and this residence must be in the county in which he proposes to vote, and in the precinct, town or ward in which he proposes to vote. He can vote where he resides, and not elsewhere.''

The case of *Lovewell* v. *Bowen,* 75 Ark. 452, 88 S. W. 570, contains an exception more apparent than real. There, through a mistake as to the correct location of the dividing line between two townships, universally acted upon, as the opinion states, electors had voted in a township in which they did not reside, but they had voted in the township which, for many years, had been universally regarded as the township in which they resided, and it was there said that ''Under such circumstances the voters should not be disfranchised on account of universal ignorance of the true technical lines.''

But that case does not hold that one may vote in a precinct other than the one in which he resides where no misapprehension as to boundaries exists. No misapprehension exists in the instant case, and the ballots of persons not voting in the township in which they resided should be excluded.

Error is assigned also in holding good the ballots cast by certain persons who did not assess. We said in the case of *Collins* v. *Jones,* 186 Ark. 442, 54 S. W. 2d 400, upon the authority of the case of *Cain* v. *Carl Lee,* 168 Ark. 64, 269 S. W. 57, that the assessment of the voters in the manner required by law was essential to qualify the voters, and that the payment of the poll tax alone did not suffice. That holding has since been several times reaffirmed. By § 4696, Pope's Digest, it is provided that ''It shall be unlawful for any person to cast a ballot in any election so held as set forth in § 4691'' (which applies to primary, as well as general, elections) ''unless the said person shall have previously assessed and paid a poll tax as now provided by law. . . .'' And it was held in the recent case of *Trussell* v. *Fish,* 202 Ark. 956, 154 S. W. 2d 587, that after the assessor has delivered his books to the county clerk on the third Monday in August, the clerk has the right to make a delinquent assessment of poll taxes, and that this right continues until midnight of October 1st.

Without reviewing the testimony upon this issue, we announce our conclusion to be that the contention that certain electors were permitted to pay poll taxes without having assessed is not sustained.

We are asked to render final judgment here, but we decline to do so, as more testimony may be necessary to apply the legal principles which we have announced.

For that purpose the judgment is reversed and the cause remanded for further proceedings.